## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| | |
|---|---|
| THE NEW YORK, SUSQUEHANNA AND WESTERN RAILWAY CORPORATION, <br><br> Plaintiff/Fourth Party Defendant, <br><br> v. | |
| LISA JACKSON, in her official capacity as Commissioner of the New Jersey Department of Environmental Protection, NEW JERSEY MEADOWLANDS COMMISSION, et al., <br><br> Defendants/Counterclaimants/Third Party Plaintiffs, <br><br> v. | Civ. Action No. 05-4010 (KSH) <br><br><br> **OPINION** |
| MHF LOGISTICAL SOLUTIONS, INC., et al., <br><br> Third Party Defendants, <br><br> v. | |
| SLANE RAIL TRANSPORT, INC. <br><br> Fourth Party Plaintiff. | |

**KATHARINE S. HAYDEN, U.S.D.J.**

## I.      INTRODUCTION

New York Susquehanna and Western Railway Corp. ("NYS&W") is a freight railroad that operates a rail network consisting of 400 track miles in the states of New York, New Jersey, and Pennsylvania.  This lawsuit arises from the activities occurring at five sites operated by NYS&W

in the Township of North Bergen, New Jersey, where construction and demolition waste and contaminated soil are loaded into rail cars for shipment to out-of-state waste dumps.[1]

Concerned that generally applicable waste disposal regulations did not apply to rail carriers engaged in the transportation of waste, the New Jersey Department of Environmental Protection ("NJDEP" or "the State") implemented a set of rules on November 15, 2004 that specifically regulates the transfer of solid waste to or from rail cars.  N.J.A.C § 7.26-2D.1 ("2D Regulations"). After the passage of the 2D Regulations, NYS&W operated the facilities without fully complying with the new rules, on the basis that the regulations are preempted by federal law.  On July 26, 2005, NJDEP issued an Administrative Order and Notice of Civil Administrative Penalty Assessment ("AONOCAPA"), assessing a multi-million dollar fine against NYS&W for its non-compliance with the 2D Regulations at the five North Bergen facilities.

NYS&W sued, and in this action for declaratory and injunctive relief, it seeks a declaration that the 2D Regulations: (1) are preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10501(b); (2) violate the Commerce Clause of the United States Constitution; and (3) are preempted by the federal Hazardous Materials Transportation Act, 49 U.S.C. § 5125(a).  NYS&W also seeks an injunction against the enforcement of the 2D Regulations. The State has filed a counterclaim and third party complaint asking the Court to enjoin NYS&W from operating its facilities until it fully complies with all applicable State statutes and State

---

[1] NYS&W refers to the sites as "transload facilities," implying that the locations are simply used to load cargo into rail cars.  The State refers to the sites as "solid waste transfer facilities," suggesting that solid waste is being processed at the sites. The Court will refer to these sites throughout this opinion as "facilities."

-2-

regulations (including the 2D Regulations), and with the terms of a prior stipulated settlement with the New Jersey Meadowlands Commission.

After several months of substantive meetings between the State and NYS&W seeking a settlement, the Court has invited briefing on what emerges as the central issue: whether the 2D Regulations are preempted by ICCTA's express preemption clause. For the reasons explained more fully below, the Court finds they are.

## II.    BACKGROUND

The disposal of solid waste in New Jersey has become increasingly problematic as the population has grown and the amount of landfill space has diminished. The State is in a constant struggle to balance the need to dispose of solid waste with the need to protect the health and safety of the public. See, e.g., Philadelphia v. New Jersey, 437 U.S. 617, 629-33 (1978) (Rehnquist, J., dissenting) (criticizing the majority's decision that a New Jersey law banning the importation of out-of-state garbage was a violation of the dormant commerce clause). This delicate balance lies at the heart of the present controversy.

As landfills have filled up within New Jersey and in other states along the East Coast, waste haulers have been forced to ship trash to more distant states, for example, Ohio. (Compl. at ¶ 26.) Rail carriers recognized a business opportunity and entered the waste hauling business, using their rail networks to ship trash to these distant landfills at rates cheaper than those offered by trucking companies. Alexander Lane, *A New Load for the Trains*, Star-Ledger, August 8, 2005, at NJ13 (reporting that a railroad recently offered the lowest bid to handle Hudson County's bulk waste).

New Jersey regulates the disposal of solid waste primarily through the Solid Waste Management Act ("SWMA"), N.J.S.A. §13:1E-1 et seq., and the corresponding regulations located at N.J.A.C. § 7:26-1.1 et seq. In enacting SWMA, the New Jersey legislature found that "the collection, disposal and utilization of solid waste is a matter of grave concern to all citizens and . . . that the health, safety and welfare of the people of this State require efficient and reasonable solid waste collection and disposal service or efficient utilization of such waste." N.J.S.A. §13:1E-2. Both "solid waste facilities" and "transfer stations" are regulated by SWMA.

A "solid waste facility" is defined in the regulations as any site or building used for the "storage, collection, processing, transfer, transportation, separation, recycling, recovering or disposal" of solid waste material. N.J.A.C. § 7:26-1.4. A "transfer station" is defined as "a solid waste facility at which solid waste is transferred from one solid waste vehicle to another solid waste vehicle, including a rail car, for transportation to an off-site solid waste facility, or a solid waste facility at which [certain] liquid waste (as defined at N.J.A.C. § 7:26-2.13(h)) is received, stored, treated or transferred . . . ." N.J.A.C. § 7:26-1.4.

NYS&W has been in the business of hauling lumber, sugar, automobiles, and other products for decades. Albeit NYS&W has only recently begun hauling construction and demolition waste on its rail lines, hauling waste is one of the fastest growing segments of its business. (Compl. at ¶ 27.) NYS&W reported that it shipped 453,222 tons of construction and demolition waste in 2004, and 339,605 tons through the first seven months of 2005. NYS&W opened the five North Bergen waste transfer stations at issue in this case between 2003 and 2005. All are located within a four mile radius in the Hackensack Meadowlands District: (1) 5800 West Side Avenue; (2) 2480 Secaucus Road; (3) 16th Street; (4) 43rd Street; and (5) 94th Street. The West Side Avenue facility

is mainly used to move bulk waste shipments from environmental site cleanups, which consist primarily of contaminated soil.  The other four facilities are used to move debris from construction and demolition operations ("C&D materials").  NYS&W opened each of these facilities aware of, but not in compliance with the requirements of SWMA, on the basis that it is not subject to state regulation because it is a rail carrier engaged in transportation.

From the time the sites became operational until this lawsuit was filed, operations at four of the five facilities, specifically, Secaucus Road, 16th Street, 43rd Street, and 94th Street, were being conducted in the open air and not in enclosed buildings.  Waste was dumped directly on the ground and was then loaded into rail cars using grapples.  Certain of the facilities controlled dust with fire hoses.

Because the West Side Avenue facility handles contaminated soil, some of which contains low-level radioactive waste, the loading process there is different.  The material arrives on a truck in a sealed container that is dumped directly from the truck into a rail car, which is lined with a special "burrito wrapper."  After the dumping is completed, the burrito wrapper is enclosed and the load is ready for shipment.

From newspaper reports in the weeks prior to this lawsuit, it appears that local residents had become extremely upset about the perceived safety and environmental hazards created by the NYS&W facilities in North Bergen.  Chief among these concerns were dust, noise, and dirty wastewater generated by the facilities.  As the Star-Ledger reported,

> George Parisek wonders what's in the dust clouds that spew from the giant trash heap near his home in North Bergen.
> "There are times it looks like a fire, there's so much dust," says Parisek, a retired mechanic.  "I grow tomatoes and peppers, and this stuff is all over them.  This drives me crazy."

> He and the neighbors constantly hose down their houses, their cars and their gardens to wash away the grime.
> And they wonder: Is it dangerous to breathe this stuff? Should they let their kids play in the yard? Should they eat the vegetables they grow in their gardens?

Tom Moran, *Railroads Just Dump on Their Neighbors*, Star-Ledger, July 27, 2005, at NJ13.

The State of New Jersey had attempted to regulate against exactly this by passing the 2D Regulations. Having determined that the Interstate Commerce Commission Termination Act ("ICCTA") might preempt SWMA as it relates to waste transfer facilities operated by railroads, NJDEP proposed the 2D Regulations on October 6, 2003. 36 N.J.R. 5098(b) (Introduction to Adoption of 2D Regulations). Pursuant to the proposal, rail carriers would be exempt from SWMA but would be required to comply with the new requirements specifically governing management of solid waste at rail carrier facilities. After a two month notice period for comment, a public hearing was held on November 21, 2003.

Public records indicate that NJDEP received 109 comments concerning the proposed regulations, at least 31 of which were submitted by NYS&W. See 36 N.J.R. 5098(b). NYS&W's comments show that it strongly believed that the regulations were preempted by ICCTA. NJDEP responded to all of the comments, made various amendments to the regulations, and adopted the 2D Regulations on November 15, 2004.

As explained by John Castner, Director of the Division of County and Waste Enforcement within NJDEP, the 2D Regulations

> were crafted specifically so that rail carriers would not be subject to permitting or pre-clearance requirements, unlike non-rail carrier solid waste transfer facilities. The purpose of the regulations was to ensure that solid waste facilities operated by rail carriers would comply with standards necessary to protect public health and safety.
> . . . .

-6-

. . . Among DEP's concerns was protecting against fires or releases into the environment such as those which happened sixteen years ago when the HUB Recycling facility caught fire and caused massive damage.  See New York Times article, "Fire in Unlicensed Newark Dump Closes Highway," dated August 8, 1989 . . . .  The HUB Recycling facility claimed it was exempt from DEP's solid waste regulation as a recycler, just as [NYS&W] claims it is exempt from DEP solid waste rail carrier regulations.

(Castner Cert. (docket entry # 12) at ¶¶ 3, 8.)

The 2D Regulations distinguish between rail carrier transfer stations which deal "exclusively in the form of sealed containers of solid waste, and that do[] not engage in any form of solid waste tipping . . . , processing, sorting or compaction, or the removal of solid waste . . . ," N.J.A.C. § 7:26-2D.1(c), and those which do engage in those enumerated activities, N.J.A.C. § 7:26-2D.1(d).  The reason for the different standards is that containerized solid waste that remains in a sealed container is thought to pose fewer environmental risks.

For facilities handling only containerized solid waste, the regulations include:

(1)      time limits on how long waste may remain at the rail facility, N.J.A.C. § 7:26-2D.1(c)(2)(i);

(2)      a requirement that the solid waste be stored in containers that do not leak, N.J.A.C. § 7:26-2D.1(c)(2)(ii);

(3)      a prohibition on the migration of odors outside the facility in violation of NJDEP air pollution regulations, N.J.A.C. § 7:26-2D.1(c)(2)(iii);

(4)      a requirement that all containers be secured at all times in a manner that prevents unauthorized access, N.J.A.C. § 7:26-2D.1(c)(2)(iv);

(5)      a requirement that all facilities maintain an adequate water supply and firefighting equipment, N.J.A.C. § 7:26-2D.1(c)(2)(v);

(6)      a prohibition on the staging of delivery trucks on public roadways outside the facilities, N.J.A.C. § 7:26-2D.1(c)(2)(vi);

(7)      a prohibition on the entry of trucks into the facility that are not properly registered, or exempt from registration, as solid waste vehicles with the Division of Solid and Hazardous Waste, N.J.A.C. § 7:26-2D.1(c)(2)(ix);

(8)      a requirement that NJDEP inspectors must be permitted to enter and inspect any portion of the facility at any time, N.J.A.C. § 7:26-2D.1(c)(2)(x); and

(9)      a requirement that each facility maintain daily records of waste received and submit quarterly reports to NJDEP, N.J.A.C. § 7:26-2D.1(c)(2)(xiii).

The regulations for facilities handling non-containerized solid waste are more extensive.  In addition to many of the foregoing regulations, the regulations for these facilities include:

(1)     a requirement that all "processing, tipping, sorting, loading, storage and compaction of materials . . . shall occur within the confines of an enclosed building that complies with all requirements of the Uniform Construction Code," N.J.A.C. § 7:26-2D.1(d)(1);

(2)     a requirement that facilities "shall have concrete or equivalent tipping floors or ramps to ensure proper containment and channeling of wastewater to sanitary sewer connections or holding tanks . . . ," N.J.A.C. § 7:26-2D.1(d)(2);

(3)     a duty to clean at least every 24 hours all areas where waste has been deposited or stored, N.J.A.C. § 7:26-2D.1(d)(4);

(4)     a duty to institute measures to prevent dust from migrating outside the buildings and off-site, N.J.A.C. § 7:26-2D.1(d)(7);

(5)     a requirement that on-site roadways be paved in areas where loading and unloading activities occur, N.J.A.C. § 7:26-2D.1(d)(12); and

(6)     a requirement that a separate, secure area be established for the drop-off or transfer of materials containing asbestos, N.J.A.C. § 7:26-2D.1(d)(18).

Facilities that fail to comply with the 2D Regulations are subject to all applicable penalties pursuant to SWMA.  N.J.A.C. §§ 7:26-2D.1(c)(2)(xiv), (d)(26).  The amount of the penalty imposed depends on the violation, but NJDEP has the authority to assess civil fines as high as $50,000 per day per violation.  N.J.A.C. § 7:26-5.4.

Almost from the outset, NYS&W's noncompliance with the 2D Regulations created problems and did not go unnoticed.  It is undisputed that just weeks after the 2D Regulations went into effect, a catastrophe was narrowly avoided at the 16th Street facility.  (Lazarus Cert. (docket entry # 16) at ¶ 5; Kayes Cert. (docket entry # 15) at ¶¶ 3-8.)  On December 15, 2004, a grappler crawling on top of the large debris pile at the site came into contact with a high voltage PSE&G power line carrying the equivalent of 230,000 volts of energy.  (Id.)  The placement of the debris pile underneath the power line combined with the size of the debris pile was nearly a deadly combination.  (Id.)  Fortunately, nobody was badly injured or killed.  (Id.)

-8-

In February 2005, State officials observed the debris piles to be approximately 25 feet high by 60 feet wide by 40 feet deep at the 16th Street facility, 25 feet high by 60 feet wide by 20 feet deep at the Secaucus Road facility, and 20 feet high by 40 feet wide by 20 feet deep at the 94th Street facility. (Lazarus Cert. at ¶¶ 3, 9, 12.) State officials observed that waste at the core of the piles was often not loaded for weeks and was highly susceptible to fire. (Mercado Cert. (docket entry # 19) at ¶¶ 7-8.) Water samples collected from three of the facilities showed the levels of lead, arsenic, mercury, and copper present in the wastewater to be in excess of the applicable Surface Water Quality Standards. (Milkulka Cert. (docket entry # 116) at ¶ 4.)

Problems continued through the summer. In July, 2005, it was reported that:

> State and local officials swooped down on a rail yard in North Bergen yesterday, hoping to find out why thousands of pounds of an explosive chemical was [sic] being stored at the site with apparently no security.
> But instead of getting answers, investigators were asking more questions after they forced the company to open two locked rail cars and found they were filled with chlorine.
> Investigators then requested the company's manifest – a record of shipments and departures – but apparently no such book exists, local officials said.
> . . . .
> Last week, local health and fire officials investigating a bad smell found more than 80 containers of an explosive chemical called phosphorus pentasulfide, which is used as an additive in oil and pesticide.
> Police reports showed the rail company routinely left gates to the facility open and the chemicals unguarded. In addition, the company never reported the chemical – which explodes when mixed with water – to local emergency services.

Jarrett Renshaw, *Explosive Chemicals in Rail Yard Called Recipe for Disaster*, Jersey Journal, July 15, 2005, at 25.

On July 25, 2005, Acting Gov. Richard Codey publicly vowed to take action against NYS&W for its failure to comply with the 2D Regulations. Unveiling a plan (dubbed Operation Safety Net) that would provide regular inspections at the facilities, he made front page news, stating:

"We're going to harass the hell out of them. . . . We want them to know that we're on their butt." Alexander Lane, *Anger at Trash-Transfer Rail Stations Intensifies in Jersey – Alleging Facilities Cause a Stink, Codey and Corzine Push for the Right to Regulate*, Star-Ledger, July 26, 2005, at 1. Gov. Codey also noted that the State might not be successful in regulating NYS&W: "We will do as much as the law allows us to do to protect New Jersey, . . . But the reality is our efforts cannot close the federal loophole these companies are using to protect themselves." Scott Fallon, *State Will Test Limit of Law on Railway Storage*, The Record, July 26, 2005, at A1.

On July 27, 2005, NJDEP served NYS&W with an AONOCAPA (the notice of civil penalty), citing the company for noncompliance with the 2D Regulations at its five North Bergen facilities. The AONOCAPA claimed that NYS&W had violated the 2D Regulations by:

(1)     not enclosing the operations within buildings;
(2)     not using concrete tipping floors or ramps;
(3)     not complying with the regulations for wastewater disposal;
(4)     not effectively controlling dust at the facilities;
(5)     not cleaning areas used for dumping or storage every 24 hours;
(6)     not keeping the facility free of litter;
(7)     not effectively controlling odors;
(8)     not adequately controlling insects, arthropods, and rodents;
(9)     not operating certified scales for waste transported by trucks;
(10)    not having concrete or asphalt paving at unloading sites;
(11)    not moving solid waste within 10 days;
(12)    not implementing effective security procedures;
(13)    not minimizing the possibility of fire, explosions, or releases to the environment; and
(14)    emitting air pollution.

The AONOCAPA directed NYS&W to comply immediately with the 2D Regulations and assessed a civil penalty of $2,500,000, based upon a penalty of $2,000 per day per facility dating back to November 15, 2004.

NYS&W filed the instant suit on August 16, 2005.

-10-

Since then, NYS&W has taken steps to bring its facilities into compliance with certain of the requirements of the 2D Regulations.  While the company still maintains that it is not required to comply with the regulations, NYS&W has made changes in order to be a "good neighbor" to the surrounding community.  NYS&W permanently closed the 16th and 43rd Street facilities and constructed buildings to enclose loading operations at the three other facilities.[2]  It reduced the size of the debris piles and instituted flow control measures to limit the amount of waste that was dumped at the sites on a daily basis.  At a hearing before this Court on December 12-13, 2005, NYS&W provided photographs demonstrating significant progress in cleaning up the transfer stations and establishing that loading operations were being conducted in enclosed buildings.

## III.   OPERATIONS AT THE FACILITIES

As noted above, the parties sharply disagree over whether the facilities are "transload facilities" or "solid waste transfer facilities."  In order to get a better understanding as to what functions are being performed at the facilities, the Court heard testimony on the subject at the December 2005 hearing.  The testimony established that while the facilities handle different types of materials, each facility operates in generally the same manner.

## A.  Operation of the "C&D facilities" (Secaucus Road, 16th Street, 43rd Street, and 94th Street)

NYS&W owns or, in the case of the 94th Street facility, leases the property each facility is located on (Oral Arg. of Pl.'s Counsel, Oct. 24, 2005 Hearing Tr. at 16:4-9). Virtually all of the activities at the C&D facilities are performed by other companies.  NYS&W has a contract with a

---

[2] NYS&W opened two new facilities in North Bergen, at 83rd Street and at Paterson Plank Road, in December 2005.  Magistrate Judge Falk granted defendants leave to file a second amended complaint to include these new facilities in an order filed December 11, 2006, but further action on the order was stayed pending the issuance of this opinion on the preemption issue.

"loading agent" at each facility that loads the rail cars and operates the facility on NYS&W's behalf. (Testimony of John Fenton, Dec. 12, 2005 Hearing Tr. at 32:8-13; 42:21-43:1; 57:11-14; 65:1-2.)

NYS&W customers, called "shippers," have capacity contracts with NYS&W that give the shippers the right to a guaranteed percentage of a facility's loading and shipping capacity. (Id. at 32:14-15; 52:22-25; 57:15-16; 65:3-5.) A shipper is essentially a consolidator of demand – it solicits customers of its own who need to dispose of bulk waste, and enters into contracts with them whereby the shipper's customers pay the shipper for the right to dump waste at the facility. (Testimony of William Rennicke, Dec. 13, 2005 Hearing Tr. at 68:11-22.) The shipper takes title to the waste and then uses its capacity contract with NYS&W to ship the waste to a distant landfill. (Testimony of John Fenton, Dec. 12, 2005 Hearing Tr. at 49:2-11.) NYS&W emphasizes that although it has "primary" shippers at each facility with large guaranteed amounts of capacity, no shipper has *exclusive* right to utilize all capacity at any facility. (Pl.'s Reply Br. (docket entry # 221) at 13-14.)

The shipper keeps an employee at each facility to tell the loading agent which waste trucks have contracted with the shipper to dump at the facility under its capacity agreement with NYS&W. (Testimony of John Fenton, Dec. 12, 2005 Hearing Tr. at 37:5-15.) When a truck enters the facility, the loading agent weighs the truck, directs the driver where to dump the waste, and then weighs the truck again prior to the truck's departure from the facility. (Id. at 36:24-37:15; 42:17-43:7; 64:12-19.) At some point thereafter, the loading agent loads the waste into rail cars, typically using an excavator with a grapple, located on NYS&W's tracks. (Id. at 37:11-15; 43:8-44:1; 65:1-2.) The rail cars are privately owned and do not belong to NYS&W. (Id. at 26:24-25.)

At or about the same time the waste is loaded into the rail cars, employees of the loading

agent extract any materials from the waste pile, such as tires and refrigerators, that may violate the shipper's agreement with the destination landfill.  (Testimony of John Fenton, Dec. 12, 2005 Hearing Tr. at 131:12-132:7.)  The shipper, which does not pay the loading agent an additional fee for extracting these non-compliant materials, is responsible for telling the loader exactly what types of materials must be removed.  (Id. at 106:14-20; 133:8-14.)  The non-compliant materials are placed in a separate pile for the shipper to remove from the premises.  (Id. at 106:7-10.)

The shipper pays a loading fee to NYS&W, which in turn pays the loading agent, to load the waste into the rail cars. (Id. at 39:15-17.)  NYS&W does not realize a profit on the loading process, which was described as a "loss leader" – a service the railroad provides customers to get them to haul freight on its line.   (Testimony of William Rennicke, Dec. 12, 2005 Hearing Tr. at 45:22.) Rather, NYS&W's primary source of income is the line hauling fee it charges the shippers to transport the material on its rail line.  (Id. at 106:18-20.)

In addition to owning or leasing the property where the facilities are located, NYS&W owns, and paid for the construction of, all buildings located on the different properties.  (Testimony of John Fenton, Dec. 12, 2005 Hearing Tr. at 64:20-21; 113:2-5; Dec. 13, 2005 Hearing Tr. at 8:3-4.) Secaucus Road, 16th Street, and 43rd Street are exclusively C&D transloading facilities; 94th Street also has equipment for transloading automobiles and timber.  (Oral Arg. of Pl.'s Counsel, Oct. 24, 2005 Hearing Tr. at 15:2-18.)

## B.  Operation of the West Side Avenue facility

The West Side Avenue facility, which is operated slightly differently because it handles contaminated soils as opposed to C&D materials, also has a loading agent.  (Testimony of John Fenton, Dec. 12, 2005 Hearing Tr. at 58:5-11.)  But this loading agent is a subsidiary of NYS&W.

(Id. at 24:13-23.)  The West Side Avenue facility has a primary shipper, MHF Logistical Solutions, Inc. ("MHF"), which has a contract with NYS&W for all of the loading and shipping capacity at the facility.  (Id. at 141:12-17.)

An MHF employee controls entry to the West Side facility because MHF's capacity contract gives it first right to use the facility.  (Testimony of John Fenton, Dec. 13, 2005 Hearing Tr. at 5:23-6:5.)  Once an authorized truck enters the facility, it is directed to proceed up to the top of a ramp, and then the  truck dumps its shipment of contaminated soil directly into a chute through which the soil drops directly into a rail car lined with a "burrito wrapper."  (Testimony of John Fenton, Dec. 12, 2005 Hearing Tr. at 59:5-17.)  Then the burrito wrapper is sealed and the load is ready for shipment.  (Id. at 60:4-10.)

No sorting, extracting, or inspecting occurs at the West Side Avenue facility.  As explained at the hearing, the soil "is all enclosed in a liner in the truck and there is no inspection of the material before it is dump[ed].  It is fully enclosed in a liner . . . [in the] truck, which is dump[ed] directly into the rail car.  And so there's no inspection of that material."  (Id. at 12:2-6.)

## IV.    CONTROLLING LEGAL PRINCIPLES

NYS&W claims that the State exceeded its powers in levying a fine against it for its failure to comply with the 2D Regulations at the North Bergen facilities.  Although NYS&W has voluntarily complied with certain aspects of the 2D Regulations, NYS&W seeks a ruling from this Court that the 2D Regulations, as applied to NYS&W, are preempted and unenforceable.

That the parties would deadlock about the 2D Regulations was established right from the beginning when NYS&W reacted to the proposed regulations during the public comment period. And the parties are not alone in staking out their territory.  How this relatively new industry will

exist in the context of federal preemption has generated other legislation and litigation, which requires a review of pertinent statutes and cases.

**A.  ICCTA**

Enacted in 1996, ICCTA created the Surface Transportation Board ("STB") and gave it exclusive jurisdiction over "transportation by rail carriers."  49 U.S.C. § 10501(b).  About ICCTA, Congress declared that

> it is the policy of the United States Government . . . to minimize the need for Federal regulatory control over the rail transportation system[,] . . . to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, . . . to reduce regulatory barriers to entry into and exit from the industry[,] . . . [and] to operate transportation facilities and equipment without detriment to the public health and safety. . . .

49 U.S.C. § 10101.  ICCTA includes an express preemption clause.  The statute states:

> The jurisdiction of the [STB] over –
>
> (1) *transportation by rail carriers*, and the remedies provided in this part [49 U.S.C. § 10101 <u>et seq.</u>] with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, *and facilities of such carriers*; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> *is exclusive*.  Except as otherwise provided in this part, *the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.*

49 U.S.C. § 10501(b) (emphases added).

ICCTA's definition of "transportation" is facially broad, and includes:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

49 U.S.C. § 10102(9).

ICCTA defines "rail carrier" as "a person providing common carrier railroad transportation for compensation, but does not include street, suburban, or interurban electric railways not operated as part of the general system of rail transportation."  49 U.S.C. § 10102(5).

**B.  Cases Discussing ICCTA Preemption**

The Ninth Circuit appears to have been the first to confront the issue of the breadth of ICCTA's express preemption clause in <u>City of Auburn v. United States</u>, 154 F.3d 1025 (9th Cir. 1998).  After the Burlington Northern and Santa Fe Railway sought to acquire and make major improvements to a rail line in the State of Washington, the City of Auburn demanded that Burlington comply with its environmental permit-review process before going ahead with the project.  <u>Id.</u> at 1027-28.  At first, Burlington cooperated with the environmental impact study, but it later claimed that it was not required to do so because ICCTA preempted the local regulations. <u>Id.</u> at 1028.  The parties did not dispute that Burlington was a railroad or that the improvements fell within ICCTA's definition of transportation – the sole issue was the scope of ICCTA's express preemption clause.

Auburn argued that ICCTA preempted only economic regulation of railroads and that the City retained its "essential local police power required to protect the health and safety of citizens." <u>Id.</u> at 1029.  The Ninth Circuit disagreed and held that ICCTA did preempt Auburn's environmental permit-review process.  <u>Id.</u> at 1031.  In reaching its holding, the court stated, "'It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad

operations.'"  Id. at 1030 (quoting CSX Transp., Inc. v. Georgia Public Service Comm'n, 944 F.

Supp. 1573, 1581 (N.D. Ga. 1996)).  The court declared that the plain language of ICCTA and the

lack of evidence that Congress intended to allow local governments to regulate railroads in this

manner compelled the conclusion that Auburn's environmental regulations were preempted.  Id. at

1031.

On the agency level, the STB summarized its position on ICCTA preemption of local

regulation in Borough of Riverdale Petition for Declaratory Order, 4 S.T.B. 380 (1999).  There the

Borough petitioned the Board for a declaratory order seeking a determination as to whether ICCTA

preempted its planning board's authority over NYS&W's construction of a truck terminal and corn

processing plant in a residential section of Riverdale, New Jersey.  Id. at *1.  The STB granted

Riverdale's request to institute a declaratory order proceeding and summarized the state of the law

on the preemption issue – specifically the clash between preemption and local police power –  to

assist the parties in resolving their dispute.  Id.

The Board's order quoted from an earlier opinion where it had given examples of local

regulations that would not be preempted by ICCTA:

> "Even in cases where we approve a construction or abandonment project, a
> local law prohibiting the railroad from dumping excavated earth into local waterways
> would appear to be a reasonable exercise of local police power.  Similarly, . . . a state
> or local government could issue citations or seek damages if harmful substances were
> discharged during a railroad construction or upgrading project.  A railroad that
> violated a local ordinance involving the dumping of waste could be fined or penalized
> for dumping by the state or local entity.  The railroad also could be required to bear
> the cost of disposing of the waste from the construction in a way that did not harm
> the health or well being of the local community."

Id. at *16 (quoting Cities of Auburn and Kent, WA--Petition for Declaratory Order--Burlington

Northern Railroad Company--Stampede Pass Line, 2 S.T.B. 330 (1997), aff'd, City of Auburn v.

United States, 154 F.3d 1025 (9th Cir. 1998)).  The STB also declared:

> Congress did not intend to preempt federal environmental statutes such as the Clean Air Act and the Clean Water Act.
>
>     . . . .
>
>     Similarly, recent precedent has made it clear that, to the extent that they set up legal processes that could frustrate or defeat railroad operations, state or local laws that would impose a local permitting or environmental process as a prerequisite to the railroad's maintenance, use, or upgrading of its facilities are preempted because they would, of necessity, impinge upon the federal regulation of interstate commerce.  That means that, while state and local government entities such as the Borough retain certain police powers and may apply non-discriminatory regulation to protect public health and safety, their actions *must not have the effect of foreclosing or restricting the railroad's ability to conduct its operations or otherwise unreasonably burdening interstate commerce*. . . .
>
>     . . . .
>
>     . . . . [I]t appears to us that state and local entities can enforce in a non-discriminatory manner electrical and building codes, or fire and plumbing regulations, so long as they do not do so by requiring the obtaining of permits as a prerequisite to the construction or improvement of railroad facilities.  With regard to the kinds of inspections that are permissible on property owned or used by interstate railroads, the potential for interference depends on the nature of the action by the state or local government and the effect on rail transportation and Board remedies; . . .
>
>     Finally, it should be noted that manufacturing and facilities *not integrally related* to the provision of interstate rail service are not subject to our jurisdiction or subject to federal preemption.

Id. at *16-23 (emphases added).

Village of Ridgefield Park v. New York, Susquehanna & Western Railway Corp., 163 N.J. 446 (2000), involved a dispute between NYS&W and a local government over the construction and operation of a train maintenance facility.  Ridgefield Park residents complained to municipal officials about "noise, fumes, soot, and ground vibrations" caused by the diesel locomotives that idled at the facility for hours at a time.  Id. at 450.  After discussions proved futile, Ridgefield Park filed suit seeking an order requiring NYS&W to (1) comply with local permitting requirements, (2) allow inspections by municipal officials, (3) cease the maintenance of a public nuisance, and (4)

shut the facility down until the local requirements were met.  Id. at 452.

The trial court granted summary judgment to NYS&W on preemption grounds.  Id.  Both the Appellate Division and the New Jersey Supreme Court affirmed, with some modifications.  Id. at 452-53.  The Supreme Court concluded that the permitting requirements were clearly preempted and that the ICCTA also preempted Ridgefield Park's common law nuisance claims.  In discussing the nuisance claims, the court stated:

> We are mindful of the difficulties that the haphazard construction of railroad facilities may cause to a railroad's host community, as when a railroad constructs a facility without involving the neighbors of the facility, the local government, or other interested parties in the decision-making process.  We are also mindful, however, of the declaration by Congress that states may not interfere with the operational aspects of railroading and that localized concerns may not burden the nationwide system of railroads.  We assume that most of the concerns of communities that host railroad facilities may be resolved without litigation and without sacrificing the Congressional goal of deregulation.

Id. at 462-63.

The Ridgefield Park decision was not a complete victory for NYS&W.   The court required NYS&W to permit reasonable inspections of its premises and to give notice when it undertook an activity that other entities would require a permit for.  Specifically,

> The Village may enforce its local fire, health, plumbing, safety and construction regulations to the extent they are applicable to the existing maintenance facility.  Because the "maintenance facilities" consist essentially of two diesel tank cars with pumping equipment, three boxcars containing administrative offices, shops and bathroom facilities, and a hand-pumped septic system, a certain degree of pragmatism on the part of the Village will be necessary in attempting to apply its relevant ordinances and regulations to the Railroad's facilities. Because of the nature of those facilities, literal compliance with all of the requirements of the Village's ordinances and regulations may be impractical, and may not be necessary to protect the public interest.
>
>     We envision that it will be the rare situation when fairly enforced fire, health, plumbing, safety, or construction regulations interfere with a railroad's operations.

Id. at 460-61.

-19-

The Third Circuit addressed ICCTA preemption in Hi Tech Trans LLC, v. New Jersey, 382 F.3d 295 (3d Cir. 2004). Hi Tech and a railroad entered into an agreement whereby Hi Tech agreed to develop and operate a C&D bulk waste loading facility at a Newark, New Jersey rail yard the railroad owned. Id. at 298. As explained by the Third Circuit:

> [The facility] operates as follows: (1) trucks hauling C&D waste arrive at the facility; (2) the trucks discharge C&D into a hopper that Hi Tech provides at the facility; and (3) the C&D waste is then loaded directly into rail cars from the hoppers. C&D waste is neither stored nor processed at the facility. Once the rail cars have been filled, [the railroad] transports them exclusively to out-of-state disposal facilities.

Id. at 299.

The State of New Jersey issued an administrative order against Hi Tech, charging it with operating a solid waste disposal facility without the permits and licenses required by SWMA. Id. at 300. Hi Tech was not fined, but it was ordered to cease operations within 20 days of the issuance of the order. Id. In response, Hi Tech filed a federal lawsuit seeking a declaration that the permitting and license requirements were preempted on the theory that the Hi Tech facility involved transportation by rail carrier. The district court did not address the preemption issue, dismissing the case on abstention grounds, and Hi Tech appealed.

The Third Circuit rejected abstention as grounds for dismissal, but reached the same outcome based on preemption. Hi Tech, 382 F.3d at 310. In so holding, the court relied heavily on the fact that Hi Tech was not certified as a rail carrier by the STB, and on the lack of an agency relationship between the loader and the railroad. Id. at 305.

> Even if we assume *arguendo* that Hi Tech's facility falls within the statutory definition of "transportation" and/or "railroad," the facility still satisfies only a part of the equation. The STB has exclusive jurisdiction over "*transportation* by rail carrier." 49 U.S.C. § 10501(a), (b) (emphasis added). However, the most cursory analysis of Hi Tech's operations reveals that its facility does not involve "transportation by rail carrier." The most it involves is transportation "*to* rail

carrier." Trucks bring C&D debris from construction sites to Hi Tech's facility where the debris is dumped into Hi Tech's hoppers. Hi Tech then "transloads," the C&D debris from its hoppers into rail cars owned and operated by CPR, the railroad. It is CPR that then *transports* the C&D debris "by rail" to out of state disposal facilities. . . . Hi Tech is responsible for constructing and maintaining the facility and CPR disclaims any liability for Hi Tech's operations. Thus, the License Agreement essentially eliminates CPR's involvement in, and responsibility for, the operation of Hi Tech's facility. Hi Tech does not claim that there is any agency or employment relationship between it and CPR or that CPR sets or charges a fee to those who bring C&D debris to Hi Tech's transloading facility.

Accordingly, it is clear that Hi Tech simply uses CPR's property to load C&D debris into/onto CPR's railcars. The mere fact that the CPR ultimately uses rail cars to transport the C&D debris Hi Tech loads does not morph Hi Tech's activities into "transportation by rail carrier." Indeed, if Hi Tech's reasoning is accepted, any nonrail carrier's operations would come under the exclusive jurisdiction of the STB if, at some point in a chain of distribution, it handles products that are eventually shipped by rail by a railcarrier.

Id. at 308-09. By finding that the facility did not involve transportation by rail carrier, the Hi Tech court concluded that ICCTA could not have preempted any state regulation of the facility. The Third Circuit also agreed with the district court's finding that "there is a well-recognized compelling state interest in the DEP's enforcement of its own environmental laws especially as to the uniquely vexing problem of solid waste facilities in a densely populated state that has suffered the scourge of unregulated solid waste facilities for decades." Id. at 309-10.

Interestingly, during the previous year the STB had reached essentially the same conclusion as the Third Circuit regarding Hi Tech's waste loading facility in Hi Tech Trans, LLC Petition for Declaratory Order, No. 34192, 2003 WL 21952136 (STB Aug. 14, 2003). Hi Tech filed a petition with the STB on June 17, 2003 seeking a declaration that the STB had exclusive jurisdiction over its Newark, New Jersey waste loading facility, but the Board concluded that the facility did not involve transportation by rail carrier. Id. at *3.

The Board's preemption discussion was not as lengthy as the Third Circuit's, but it did make three significant points. First, the STB cited the Ninth Circuit's decision in City of Auburn for the proposition that state and local governments are not completely without power to regulate transloading activities by rail carriers. Id. at *3 n.11. "[Preemption] does not prevent state and local governments from imposing appropriate health and safety regulations and exercising their police powers. But state and local laws and regulations are preempted when the challenged statute or regulation stands as an obstacle to authorized rail transportation." Id.

Second, the STB ruled that Hi Tech's transloading activities did in fact fall within the ICCTA's broad definition of transportation. Id. at *4. In this respect, the STB declared that its jurisdiction "may extend to certain activities and facets of rail transloading facilities, but that any such activities or facilities must be *closely related* to providing direct rail service." Id. (emphasis added).

Finally, the Board indicated that its preemption decision may have been different if the facility was operated by a certified rail carrier: "[T]his situation is substantially different from a situation in which a rail carrier builds and owns a truck-to-rail transloading facility, and holds it out to the public as its own facility, but chooses to have it run by a contract operator." Id. at *4 n.13. NYS&W relies heavily on this language in distinguishing its facilities from the facility at issue in Hi Tech.

In J.P Rail, Inc. v. New Jersey Pinelands Commission, 404 F. Supp. 2d 636, 638 (D.N.J. 2005) (Simandle, J.), the court applied the Hi Tech decision in finding that a waste transfer facility in Mullica Township, New Jersey, would likely not involve "transportation by rail carrier." The facts in J.P. Rail were very similar to those in Hi Tech, although the facility at issue had not yet

opened for business, and would be accepting both putrescible and non-putrescible municipal solid

waste.  Id. at 642.  The court described the facility's planned operations as follows:

> [J.P. Rail] asserts that it will handle materials such as lumber, finished goods,
> recyclable, and as well as municipal solid waste such as construction and demolition
> debris.
> . . . . [J.P. Rail] asserts that it will only accept [putrescible waste] if it arrives
> to the Facility in airtight sealed containers. [J.P. Rail] will then directly load the
> sealed container onto a flatcar or transfer it to another sealed container. [J.P. Rail]
> assures that at no time will putrescible waste be dumped on the tipping floor or be
> stored at the Facility.  If, on the other hand, the material is non-putrescible, [J.P. Rail]
> will first place it on the tipping floor.  Next, [J.P. Rail] will remove the recyclables
> to be prepared for separate shipment in boxcars.  Similarly, all metals will be
> removed prior to loading so as to prevent damage to the railcars.
> . . . .
> Importantly, almost none of the waste will initially be transloaded in closed
> containers from truck to railroad car.  Instead, as confirmed by Plaintiff's counsel at
> the hearing, the dominant portion of [J.P. Rail's] initial hauling contracts involve
> construction wastes and recyclables which will be dumped on the tipping floor before
> being loaded into rail cars for shipments.
> Defendant New Jersey Pinelands Commission characterizes the proposed
> facility in different terms.  Defendant maintains that the Facility "will operate as a
> solid waste transfer station – involving sorting, segregating, and processing of solid
> waste – and not as a transloading facility that involves the mere loading and
> unloading of materials."  This Court agrees that the facts support the Commission's
> characterization.

Id. at 642-43 (footnotes and citations omitted).

In analyzing the preemption claim, Judge Simandle assumed that the proposed facility

involved "transportation" as defined by ICCTA,  J.P Rail, 404 F. Supp. 2d at 650 n.24, but

concluded that a rail carrier was not sufficiently involved with the facility to vest the STB with

exclusive jurisdiction over its operations.  Id. at 651.  The court noted that J.P. Rail did not own the

property on which the proposed facility would be located, did not control the loading operations at

the facility, and was not liable for damage caused at the facility.  Id. at 645.  Rather, J.P. Rail

controlled the two lots pursuant to a ground lease under which it paid the owners, Steve Waszen,

Sr. and Steve Waszen, Jr., only $1 for each of two ten year terms. Id. Significantly, a company controlled by the Waszens performed all of the loading activities and was "almost exclusively responsible for funding the facility's development and operational costs . . . ." Id. at 651. J.P Rail intended "to derive revenue for hauling the loaded railcars away from the Facility under haulage agreements, playing no role in the delivery, sorting or loading of waste in the Facility." Id. at 646. In light of the tenuous relationship between the rail carrier and the proposed facility, the court opined that the facility would involve, at most, "transportation *to* rail carrier" as opposed to "transportation *by* rail carrier." Id. at 651-52.

In contrast, Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 640 (2d Cir. 2005), involved a *bona fide* rail carrier that was proposing to build transload facilities alongside its tracks on property it owned in Vermont.  The facilities would serve the following purposes:

> (1) unloading bulk salt arriving by rail for local distribution by truck or for temporary storage in a shed pending distribution; (2) temporary storage and transport of "non-bulk goods, such as steel pipe[s]"; and (3) unloading bulk cement arriving by rail for storage in silos and eventual transport by truck.

Id.  The dispute revolved around a Vermont environmental land use statute that mandates preconstruction permits for certain land development within the state.  Id.  A prerequisite to obtaining a permit is an environmental impact evaluation, which considers potential water or air pollution, as well as "undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas."  Id.  The rail carrier applied for and obtained preconstruction permits for the proposed facilities, but the permits contained numerous stipulations, including the size, shape, and color of the buildings, as well as a minimum distance of buildings from the Connecticut River. Id. at 640-41.  Upon the completion of construction, the State inspected the facilities and cited the rail carrier for not complying with the terms of its permits and for

constructing a salt storage shed on the property without a permit.  Id. at 641.  The rail carrier filed

suit seeking a declaration that ICCTA preempts Vermont's environmental land use statute as it

relates to the transload facility.

The district court granted summary judgment for the railroad, finding that ICCTA preempted

Vermont's permitting requirement because "(i) it 'unduly interfere[s] with interstate commerce by

giving the local body the ability to deny the carrier the right to construct facilities or conduct

operations,' . . . and (ii) it can be time-consuming, allowing a local body to delay construction of

railroad facilities almost indefinitely."  Green Mountain, 404 F.3d at 643 (quoting Green Mountain

R.R. Corp. v. Vermont, No. 01-181, 2003 U.S. Dist. LEXIS 23774, at *13 (D. Vt. Dec. 15, 2003)).

The Second Circuit affirmed.

Although the circuit court held that Vermont's permitting scheme was clearly preempted by

ICCTA, it noted that railroads are not exempt from all state and local regulation.  Writing for the

unanimous panel, Judge Jacobs stated:

> [A]s the district court observed, "not all state and local regulations are preempted [by
> ICCTA]; local bodies retain certain police powers which protect public health and
> safety."  It therefore appears that states and towns may exercise traditional police
> powers over the development of railroad property, at least to the extent that the
> regulations protect public health and safety, are settled and defined, can be obeyed
> with reasonable certainty, entail no extended or open-ended delays, and can be
> approved (or rejected) without the exercise of discretion on subjective questions.
> Electrical, plumbing and fire codes, direct environmental regulations enacted for the
> protection of the public health and safety, and other generally applicable, non-
> discriminatory regulations and permit requirements would seem to withstand
> preemption.

Id.

**V.    ANALYSIS**

ICCTA preempts State regulation of "transportation by rail carriers." 49 U.S.C. § 10501(b). Therefore, the Court must determine as a threshold matter: (1) whether the activities occurring at the five NYS&W sites in North Bergen, New Jersey qualify as "transportation";  and (2) whether the activities occurring at the sites are being performed by a "rail carrier."

Before addressing the parties' arguments, the Court responds to the State's position that the regulations at issues are beyond the reach of federal preemption because they do not propose to regulate transportation by rail carriers. The AONOCAPA being challenged in this case was assessed against NYS&W for its non-compliance with the 2D Regulations at the five North Bergen facilities. NYS&W filed the present suit seeking a declaration that the 2D Regulations are preempted by ICCTA.  By their very terms, the 2D Regulations apply only to a "*rail carrier* that engages in the *transportation* of solid waste." N.J.A.C. §§ 7:26-2D.1(c), (d).  The regulations do not define the term transportation, but specifically adopt ICCTA's definition of rail carrier.  N.J.A.C. §§ 7:26-2D.1(a).  It is not persuasive, then, for the State to argue that the 2D Regulations are not preempted by ICCTA because they do not regulate transportation by rail carriers, when on their face the regulations apply *only* to rail carriers that engage in the transportation of solid waste and the State has fined NYS&W for violating the 2D Regulations.

**A.  Transportation**

"Transportation" includes –

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, *yard, property, facility*, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an argument concerning use; and

(B) services related to that movement, including receipt, delivery, elevation, *transfer in transit*, refrigeration, icing, ventilation, *storage*, *handling*, and interchange of passengers and property.

49 U.S.C. § 10102(9) (emphases added).

A plain reading of the statute provides for a very broad definition of transportation and includes both the line-haul movement of cargo as well as facilities and services "related to" that movement.  Arguably, from the cases reviewed above, the STB has signaled that the definition of transportation is less sweeping than the text of the statute implies.  For example, the STB stated in Riverdale that "facilities not *integrally related* to the provision of interstate rail service are not subject to [its] jurisdiction or subject to federal preemption." Borough of Riverdale Petition for Declaratory Order, 4 S.T.B. 380, at *23 (1999) (emphasis added).  During the High Tech litigation, the STB declared that transloading activities and facilities "must be *closely related* to providing direct rail service," in order to constitute transportation under ICCTA.  Hi Tech Trans, LLC Petition for Declaratory Order, No. 34192, 2003 WL 21952136, at *4 (STB Aug. 14, 2003) (emphasis added).

But whether "transportation" is construed narrowly or broadly is not dispositive here, because the facilities in North Bergen serve a singular purpose – to load cargo for eventual shipment to out-of-state destinations.  C&D waste and contaminated soil is dropped off and loaded into rail cars shortly thereafter.  The record establishes that the more that is loaded and shipped, the more income NYS&W earns.  There has been no evidence that NYS&W generates revenue at the facilities from activities other than line-haul transportation, loading fees, and facility capacity charges, which drives the conclusion that the five NYS&W facilities are rail transload facilities – nothing else.  Whether the broad definitional standard or the more calibrated reading from reported

-27-

decisions is applied to activity at the facilities, based on consistent holdings by the STB and the federal courts that transload facilities and equipment constitute "transportation" under ICCTA, the Court concludes that the North Bergen facilities constitute transportation.  See, e.g., Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 640 (2d Cir 2005); Hi Tech Trans, LLC Petition for Declaratory Order, 2003 WL 21952136, at *4.

The State argues against this conclusion by characterizing the four C&D facilities (Secaucus Road, 16th Street, 43rd Street, and 94th Street) as "solid waste disposal facilities," because the loading agents extract certain materials on the premises.  This argument is unpersuasive.  Testimony revealed that the extraction of non-compliant materials occurs *during* the loading process – it is not a separate process.  (Testimony of John Fenton, Dec. 12, 2005 Hearing Tr. at 131:23-132:5.)  This additional service being performed by the loaders is similar to NYS&W removing a Toyota Camry from a shipment that it knows should only include Ford Explorers.  The fact that the cargo is C&D material as opposed to traditional rail cargo like automobiles or timber, does not, as the State suggests, alter the analysis.  As explained by NYS&W's expert, William Rennicke,

> The acceptance or the location and removal [of] commodities or products and material that was not consistent with the loading contract and removal of those facilities from the site are, that is a type of activity that I would expect that you would want any customers to come in and take something that had been inappropriately delivered to you. . . . At the railroad site.  And it happens very frequently.  In the container industry, if there is a damaged container, [mis-]routed container, container that had shifter load or bad doors, it gets removed and the customer[] comes and takes it.

(Testimony of William Rennicke, Dec. 13, 2005 Hearing Tr. at 62:20-63:6.)

Also, the STB's decisions in Hi Tech and Riverdale provide little support for the State's arguments that NYS&W facilities are not transportation.  The STB's Hi Tech decision (albeit holding that Hi Tech was not a rail carrier), stated that "[t]here is no dispute that Hi Tech's

-28-

transloading activities are within the broad definition of transportation," and noted that the STB

"has consistently found such activities to be transportation under 49 U.S.C. 10102(9)."  Hi Tech,

2003 WL 21952136, at *4.   Moreover, the STB's statement in Riverdale that a facility must be

"integrally related to the provision of interstate rail service" was made in the context of discussing

whether a corn processing plant on a rail carrier's property would qualify as transportation pursuant

to ICCTA.  Riverdale, 4 S.T.B. 380, at *23.  The situation in this case is quite different – here the

activity alleged to fall outside of the definition of transportation is being performed *as part of* the

loading process and thus does not morph the NYS&W facilities from transload facilities into waste

disposal facilities.

**B.  By Rail Carrier**

A finding that the facilities involve transportation is not sufficient on its own to create the

possibility of preemption – the transportation must be performed *by rail carrier* to fall within the

purview of ICCTA's express preemption provision.  49 U.S.C. § 10501(b).

ICCTA defines a rail carrier as "a person providing common carrier railroad transportation

for compensation . . . ."  49 U.S.C. § 10102(5).  The State argues that the five NYS&W facilities

at the center of this controversy are not rail carrier facilities because (1) the use of an exclusive

shipper at each transload facility shows that the facilities are not "common carrier" facilities, and

(2) similar to Hi Tech Trans LLC, v. New Jersey, 382 F.3d 295 (3d Cir. 2004), and J.P Rail, Inc. v.

New Jersey Pinelands Commission, 404 F. Supp. 2d 636, 638 (D.N.J. 2005), the operations are set

up as transportation *to* rail carrier, as opposed to *by* rail carrier, because NYS&W does not maintain

sufficient control over activities at the facilities.

The State's arguments appear inconsistent with a position it took earlier in the litigation. Paragraph 11 of the State's answer "admit[s] that NYS&W is a rail carrier but den[ies] the allegations in paragraph 11 of the Complaint to the extent they imply that the jurisdiction of the Surface Transportation Board . . . is exclusive . . . ." (Def.'s Answer (docket entry # 25) at ¶ 11.) Additionally, paragraph 17 of the State's original counterclaim, which has since been amended to exclude the admission, stated, "NYS&W . . . is an interstate rail carrier regulated by the Surface Transportation Board ("STB"), pursuant to the Interstate Commerce Commission Termination Act ("ICCTA")." (Def.'s Counterclaim (docket entry # 25) at ¶ 17.)  Even overlooking these prior admissions that NYS&W *is* a rail carrier, at least in certain contexts, the State's arguments in its briefs and at oral argument why NYS&W actually *is not* a rail carrier are unavailing.  Addressing them in turn:

**1. The State's argument that the use of exclusive shippers at each facility shows that the facilities are not "common carrier" facilities as defined by ICCTA.**

Citing Kieronski v. Wyandotte Terminal R.R., Co., 806 F.2d 107 (6th Cir. 1986), the State argues that NYS&W is not a common carrier because the company's "exclusive shipper" arrangements at the five facilities prevent it from offering its shipping services to the public generally. While NYS&W objects to the State's contention that the shippers at the North Bergen facilities are "exclusive shippers," the evidence leads the Court to conclude that this is a reasonable description because one shipper at each facility has the contractual right to utilize virtually all of the facility's loading and shipping capacity, and the shipper controls access to the facility.  (Testimony of John Fenton, Dec. 12, 2005 Hearing Tr. at 119:5-11; 125:16-20.)  However, this does not necessarily mean that NYS&W is not operating as a "common carrier" at the facilities.

Kieronski involved a suit brought under the Federal Employers' Liability Act ("FELA"), which holds "common carrier" railroads liable for on-the-job injuries sustained by their employees. 806 F.2d at 107-08.  The sole issue on appeal was whether the district court had erred in holding that the defendant, Wyandotte Railroad Co., was not a common carrier under FELA.  Id. at 108.  In affirming the district court's decision that Wyandotte was not a common carrier, the Sixth Circuit conducted a fact-sensitive analysis and rejected any hard and fast test for determining whether a company is a common carrier.  Id. at 108-09.  The opinion indicates that the "in-plant" characteristics of the facility at issue, and nothing more, persuaded the panel majority that Wyandotte was not a common carrier under FELA.  Id. at 109.  None of the facilities involved in the present litigation have in-plant features.

Adopting the State's position would result in a tortured reading of the statute because the facilities serve the public despite the exclusive shipper arrangements.  The shippers function as a consolidator of demand and contract with any and all customers who want to have their debris hauled out-of-state.  In this way, NYS&W acts as a public servant in hauling the debris, not as a conduit for the output of an exclusive entity.

The Supreme Court has stated that rail facilities that "lead only to a single industry or establishment," or that are "constructed to furnish an outlet for the products of a particular plant," qualify as public facilities.  Union Lime Co. v. Chicago & N.W. Ry. Co., 233 U.S. 211, 221 (1914) (holding that condemnation of private land for the purpose of extending a rail line into two limestone quarries constituted a taking of property for public use).  In Union Lime, the Supreme Court also quoted its decision in Hairston v. Danville & Western Rwy. Co., 208 U.S. 598, 608 (1908): "The uses for which the track was desired are not the less public because the motive which

dictated its location over this particular land was to reach a private industry, or because the proprietors of that industry contributed in any way to the cost." Id. at 222.

NYS&W submitted evidence, not disputed by the State, that the concept of dedicated transload facilities is neither unusual nor an erosion of the public purpose. Its expert report noted that "[t]he provision of 'dedicated' intermodal transload facilities is a practice common in the industry and one that is driven by several important and practical considerations." (Expert Report of William J. Rennicke (Pl.'s Ex. # 22) at 25.) Continuing, "[d]edicated facilities are a common feature of transloading and other intermodal activities and, in particular, of such activities conducted in support of important large-volume shippers of commodities like automobiles, lumber, and C&D." (Id.)

The State has not offered, and the Court has not found, any case indicating that the Supreme Court's opinions in Union Lime and Hairston are no longer good law. Moreover, the expert report submitted by NYS&W shows that it is not uncommon for transload facilities serving other industries to be dedicated to a single customer. For these reasons, the Court concludes that the five facilities at issue in this litigation still qualify as "common carrier" facilities pursuant to ICCTA despite the fact that NYS&W has contractually agreed to give exclusive access to specific shippers at each of the facilities.

**2. The State's argument that this case is controlled by Hi Tech and J.P. Rail.**

In Hi Tech, the Third Circuit held that a nonrail carrier's operation of a transload facility on a rail carrier's property involves, at most, "transportation *to* rail carrier," and does not qualify as "transportation *by* rail carrier" pursuant to ICCTA. 382 F.3d at 308. The facts behind that holding are that: (1) Hi Tech, a nonrail carrier, was responsible for constructing and maintaining the facility;

(2) the rail carrier disclaimed all liability for Hi Tech's operation of the facility; (3) Hi Tech did not claim that there was any agency or employment relationship between it and the rail carrier; and (4) Hi Tech, not the rail carrier, set and charged a fee to those who brought C&D debris to the transloading facility.  Id. at 308.

In J.P Rail, Judge Simandle had similar facts, and relied on the same factors applied by the Third Circuit in Hi Tech in finding that the proposed waste transfer facility did not involve "transportation by rail carrier."  404 F. Supp. 2d at 638.

The State claims that the decisions in Hi Tech and J.P. Rail compel the Court to conclude that the five facilities at issue in this litigation also involve "transportation *to* rail carrier" as opposed to "transportation by rail carrier."  The Court disagrees. "Whether a particular activity constitutes transportation by rail carrier under [ICCTA] *is a case-by-case and fact-specific determination*."  Hi Tech Trans, LLC Petition for Declaratory Order, No. 34192, 2003 WL 21952136, at *3 (STB Aug. 14, 2003).  Making a case-by-case and fact-specific determination quickly reveals factual distinctions.  First, a rail carrier was not a party to the litigation in either Hi Tech or J.P. Rail, whereas here, a *railroad* licensed by the STB is claiming the exemption from State regulation. Additionally, it is hard to ignore that NYS&W is the record owner or lessor of the property the facilities are located on, has paid the costs for erecting buildings at the facilities, is paid a loading fee by the shippers at each facility, and does not disclaim liability for the loading onto its rail cars by its loading agents.  Where a "rail carrier builds and owns a truck-to-rail transloading facility, and holds it out to the public as its own facility, but chooses to have it run by a contract operator," the STB would find preemption according to its discussion in Hi Tech Trans, LLC Petition for Declaratory Order, 2003 WL 21952136, at *4 n.13.   Such is the situation here.

-33-

The Third Circuit and STB decisions in <u>Hi Tech</u> soundly reject the metamorphosis of an entity from a non-rail carrier to a rail carrier.  Likewise, it seems unlikely that Congress or the STB would accept an analysis that carves portions that are seamlessly part of the rail carrier's operations out of the exclusive jurisdiction of the STB.  Until Congress passes legislation that does just this, decisional law in this Circuit goes directly against the State's position.

Based on the facts established in this record, and the analysis in the relevant cases and the text of the relevant statute, the Court holds that the activity at the North Bergen facilities does constitute transportation by rail carrier.

## C.  The Effect of ICCTA's Express Preemption Clause on the 2D Regulations

Having determined that the five NYS&W facilities involve "transportation by rail carrier" as defined by ICCTA, the only remaining issue is whether the 2D Regulations are preempted by ICCTA's express preemption provision.

The Supreme Court has declared that the "exercise of federal supremacy is not lightly to be presumed," <u>New York State Dep't of Soc. Servs. v. Dublino</u>, 413 U.S. 405, 413 (1973) (quoting <u>Schwartz v. Texas</u>, 344 U.S. 199, 202-03 (1952)), and that congressional purpose is "the ultimate touchstone in every preemption case."  <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 485 (1996).  "The starting point in statutory interpretation is the 'language [of the statute] itself," <u>United States v. James</u>, 478 U.S. 597, 604 (1986) (quoting <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 756 (1975) (Powell, J., concurring)), and where the statutory command is straightforward, "there is no reason to resort to legislative history."  <u>United States v. Gonzales</u>, 520 U.S. 1, 6 (1997).

ICCTA's preemption provision is one of the broadest preemption provisions, how broad was described by the Ninth Circuit thus: "'It is difficult to imagine a broader statement of Congress's

intent to preempt state regulatory authority over railroad operations.'" City of Auburn v. United States, 154 F.3d 1025, 1030 (9th Cir. 1998) (citing CSX Transp., Inc. v. Georgia Public Service Comm'n, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996)).  The statutory command is quite clear – Congress sought to make federal regulation of railroads exclusive.  Burlington Northern Santa Fe Corp. v. Anderson, 959 F. Supp. 1288, 1294-95 (D. Mt. 1997).  While it is well settled that ICCTA's preemption clause does not strip State and local governments of their traditional police powers to protect public health and safety, the police power exception allows only "generally applicable, non-discriminatory regulations" that "are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions."  Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 643 (2d Cir. 2005).

The 2D Regulations were passed to protect the public health and safety of New Jersey residents.  They are intricate, detailed, and deliberately address as many aspects of the transloading activity as possible.  Inevitably and on purpose, their impact on transloading is serious and serves local concerns.  And as such, they have too large an impact on transportation by rail carriers to pass muster under the police powers exception.

While the State was careful not to impose an advance permitting requirement, the 2D Regulations give NJDEP the authority to assess civil fines as high as $50,000 per day, per violation, per facility.  N.J.A.C. §§ 7:26-5.4.  Fines of this magnitude would force the railroad to either shut down its facilities until they comply with every aspect of the regulations or face massive fines for each day of noncompliance.  There are provisions that  dictate the design, construction, and operation of transload facilities, making immediate compliance nearly impossible in most cases.

See, e.g., N.J.A.C. 7:26-2D.1(d)(1-4, 9, 11, 12, 16, 17, 21,22, 27).  As a practical matter, the effect of the 2D Regulations is hardly different from a scheme that requires advance permits.

      The 2D Regulations also give the State significant discretion on subjective questions.  For example, provisions authorize the State to penalize NYS&W if the company does not maintain "*[e]ffective* security procedures . . . to control entry and exit at all times," and "*adequate* water supply and *adequate* fire-fighting equipment"; or if waste containers are not "secured at all times in a manner that prevents unauthorized access"; or if dust migrates outside the facilities; or if the staging of waste vehicles causes "traffic backups and *related traffic hazards*" on public roadways. N.J.A.C. 7:26-2D.1(c)(2)(iv), (c)(2)(v), (c)(2)(vii), (d)(7), (d)(9), (d)(22) (emphases added).   It is reasonable to conclude that compliance will involve discretionary acts on the part of the railway, and assessing compliance with these value-based requirements will result in open-ended delays. The subjective quality of key regulations, coupled with the State's "right to enter and inspect any building or other portion of a rail facility, at any time" to determine compliance with the statutes and regulations of NJDEP, N.J.A.C. 7:26-2D.1(d)(23), confer power on the State over railroad operations that is manifestly extensive. Such power is impermissible because it "can be used to frustrate transportation-related activities and interfere with interstate commerce."   Borough of Riverdale Petition for Declaratory Order, 4 S.T.B. 380, *19 (1999).  As the New Jersey Supreme Court noted in Village of Ridgefield Park v. New York, Susquehanna & Western Railway Corp., 163 N.J. 446, 462 (2000), these types of "localized concerns may not burden the nationwide system of railroads."

      Moreover, on their face the 2D Regulations apply only to rail carriers engaged in the business of hauling solid waste, and therefore are neither "generally applicable" nor "non-discriminatory."

Green Mountain, 404 F.3d at 643.  As such they are not covered by the police powers exception.

Id.  The State does not retreat, nor can it, from the fact that its 2D Regulations are a comprehensive and complex scheme arrived at to cover the panoply of problems attendant on disposing of debris and waste by a new player on the scene.  But that player is a rail carrier, and in placing it within the cross hairs, the State has gone beyond its police powers.  Notwithstanding the critical issue of how this small, dense state may safely dispose of its waste, and the justifiable concerns raised by NYS&W's initial activities on its North Bergen sites, this Court is constrained to hold that application of the 2D Regulations here is foreclosed by ICCTA's preemption provision.

## VI.   CONCLUSION

In filing the present suit, NYS&W sought a declaration that the 2D Regulations are preempted by ICCTA as well as an order permanently restraining the State from enforcing the 2D Regulations and the July 27, 2005 AONOCAPA.  On August 16, 2005 the Court filed an order granting NYS&W temporary relief from enforcement of both the 2D Regulations and the AONOCAPA.  Because the Court has determined that ICCTA preempts the 2D Regulations, those temporary restraints will be made permanent.  The Court is aware that this opinion does not address all of the issues raised in the State's counterclaim.  The parties are directed to confer with Magistrate Judge Falk with respect to continuing case management.  An order consistent with the finding of preemption will be filed.

Dated: February 20, 2007                                    /s/  Katharine S. Hayden
                                                                         Katharine S. Hayden, U.S.D.J.